UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
┌─────────────────────────────────────┐
│ CRAIG J. GOLDSMID,                   │
│                                      │
│          Plaintiff,                  │
│                                      │
│      v.                              │
│                                      │
│ LEE RAIN, INC., and LINO             │
│ FIOCCHI, III                         │
│                                      │
│          Defendants.                 │
└─────────────────────────────────────┘
```

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 12-3666
          (JEI/JS)

**OPINION**

**APPEARANCES:**

ATTORNEYS HARTMAN, CHARTERED
By:  Katherine D. Hartman, Esq.
     Michael C. Mormando, Esq.
505 S. Lenola Road, Suite 121
Moorestown, New Jersey 08057
     Counsel for Plaintiff.

GRUCCIO, PEPPER, DE SANTO & RUTH, P.A.
By:  John R. Dominy, Esq.
817 E. Landis Avenue
P.O. Box 1501
Vineland, New Jersey 08362
     Counsel for Defendants.

**Irenas**, Senior District Judge:

This suit concerns alleged violations of the federal Fair

Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), and related

state-law claims.  Pending before this Court is Defendants'

Motion for Summary Judgment.[1]  For the reasons set forth below,

this Motion will be granted in part and denied in part.

---

[1] The Court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1331
and § 1367.

The events giving rise to this lawsuit stem from Plaintiff Craig Goldsmid's ("Goldsmid") employment at Defendant Lee Rain, Inc., an irrigation business in Vineland, New Jersey owned by Defendant Lino Fiocchi ("Fiocchi") and his brother, Todd Fiocchi. (Lino Fiocchi Dep., Jan. 17, 2013, at 10:1-24) Goldsmid joined Lee Rain, Inc. on January 30, 2007, and worked there in multiple roles until his termination on June 20, 2011. (Id. at 73:13, 109:4)

When he was first hired, Goldsmid began working at the front counter, where he primarily waited on customers. (Fiocchi Dep. at 73:22-24; Craig Goldsmid Dep., Jan. 15, 2013, at 24:21-25:9) At the counter, Goldsmid was paid twelve dollars per hour and generally worked forty hours per week. After thirty days, he received a raise to twelve dollars and fifty cents per hour, and sometime in 2009, his hourly wage increased to thirteen dollars. (Fiocchi Dep. at 74:14-75:4; Goldsmid Dep. at 25-26)

Goldsmid worked in other capacities while employed at Lee Rain. For a brief period he worked in the field, but sometime in 2009 Goldsmid moved into the warehouse, where he remained until his termination. (Fiocchi Dep. at 78:21-79:2; Goldsmid Dep. at 28:18-22) As an hourly warehouse employee, Goldsmid was expected to work a forty-hour week, with an overtime hourly wage

equal to one and a half times his normal wage whenever his work exceeded forty hours. (Fiocchi Dep. at 80:22)

In early 2010, Fiocchi prepared a set of Standard Operating Procedures ("SOPs") for the warehouse, which were designed to help employees understand the work flow at Lee Rain, and were distributed to Goldsmid and other warehouse employees. (Id. at 35:21) The warehouse SOPs ran a total of five pages and included two job descriptions for warehouse personnel, as well as a bonus policy and a personnel accountability policy. (Lee Rain Inc. SOPs, Feb. 7, 2010; Fiocchi Dep. at 38:14-16)

In March 2010, while working in the warehouse, Goldsmid moved from an hourly wage to a fixed salary. (Fiocchi Dep. at 81:12) In deposition testimony, Fiocchi indicated that the move was intended to provide consistent pay throughout the year for employees during the slow winter months when hourly work might be scarce. (Id. at 81:13-21) Once on salary, Goldsmid worked forty-five hours per week, but was not paid any overtime for any hours in excess of forty five. (Id. at 83:25-84:9) Fiocchi constructed Goldsmid's salary by multiplying Goldsmid's thirteen dollar hourly wage by forty hours, and then adding an additional five hours multiplied by an hourly wage of nineteen dollars and fifty cents; in other words, forty hours at the standard wage, plus five hours at a standard overtime wage. (Id. at 84:1-9) Though the sum came out to a weekly wage of $617.50, Goldsmid

actually received $615 per week as salary.  (Goldsmid Dep. at 31:14; Fiocchi Dep. at 84:1-9)

In February 2011, David Lachowitz, Goldsmid's accountant, approached Goldsmid regarding his wages.  (Goldsmid Dep. at 32:12-19)  After Goldsmid explained his transition to salary, Lachowitz gave Goldsmid a fact sheet from the federal Department of Labor Wage and Hour Division that explained how the Fair Labor Standards Act mandated overtime pay for workweeks in excess of forty hours.  (Id. at 33:8-9)

Shortly after becoming aware of the federal overtime pay requirements, Goldsmid began sharing that information with others at Lee Rain, Inc.  (Goldsmid Dep. at 33:17; Deborah Martine Dep., March 18, 2013, at 22:11-13)  In particular, Goldsmid brought a copy of the paper to his direct supervisor in the warehouse, Debbie Martine.  (Martine Dep. at 20:21-21:7) Though Martine did not read the fact sheet at the time, she testified that she knew the fact sheet raised issues with employee wages at Lee Rain.  (Id. at 27:7-9)

Not long after handing the fact sheet to Martine, Fiocchi approached Goldsmid after he noticed that Goldsmid's attitude around the warehouse changed.  (Fiocchi Dep. at 141:1-7)  In a conversation in March 2011, Goldsmid told Fiocchi that he felt as though his wages had declined since the switch from an hourly wage to a fixed salary.  (Fiocchi Dep. at 141:11-14; Goldsmid

Dep. at 42-43)  Fiocchi assured Goldsmid that was not his intention, and the two met a few days later to discuss how Fiocchi constructed Goldsmid's salary.  (Fiocchi Dep. at 142:1-14; Goldsmid Dep. at 42-43)  In his deposition testimony, Goldsmid conceded he did not explicitly tell Fiocchi of his overtime wage concerns, although he did explain that he was working more hours than he had previously.  (Goldsmid Dep. at 41:21-42:1)

Between March and June 2011, Goldsmid continued work at Lee Rain, and was never disciplined or spoken to again regarding his wage concerns.  (Goldsmid Dep. at 46:9-15)  Fiocchi maintains that Goldsmid was "disruptive" and a poor performer as an employee, culminating in the weeks leading up to his firing. (Fiocchi Dep. at 115:21, 102:12-24)  Just two to three weeks before Goldsmid's last day, Fiocchi explained that his brother Todd pulled Goldsmid aside early one morning regarding his performance.  (Fiocchi Dep. at 103:1-12)  In response to the criticism, Goldsmid threw a box across the shop, in full view of Fiocchi, Todd, and Ron Petrowsky, another supervisor.  (Fiocchi Dep. at 103:1-24)  In his opposition to summary judgment, Goldsmid disputes that the box incident ever occurred and highlights that no witness corroborates Fiocchi's account, but nonetheless Goldsmid was terminated upon his arrival at work on June 20, 2011, just two to three weeks after the incident in the

shop. (Fiocchi Dep. at 111:11) As a result of a newspaper advertisement placed a month earlier, two individuals began work in the warehouse on June 21, 2011 to replace Goldsmid, one day after his firing.[2] (Fiocchi Dep. at 110:2-10)

Not long after his termination, Goldsmid contacted the State of New Jersey and the federal government to file a complaint regarding his wages. (Goldsmid Dep. at 41:22-23) The state initiated an investigation, and after obtaining records and speaking with Fiocchi, the New Jersey Department of Labor ("NJDOL") determined that Lee Rain, Inc. failed to pay Goldsmid overtime wages under the Fair Labor Standards Act. (NJDOL Settlement, May 3, 2012) Based on an agreement between Lee Rain and the NJDOL, Goldsmid accepted the overdue wages. (Goldsmid Dep. at 49:16-50:12)

On June 18, 2012, Goldsmid filed his Complaint in this Court, alleging violations of FLSA and New Jersey state-law claims. Count One alleges that the Defendants' pay practices violated FLSA, and Count Two alleges that Goldsmid's termination violated FLSA's retaliation provision. Count Three alleges a violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 – 14, for retaliation. Count

---

[2] Whether the box-throwing incident, apparently two to three weeks before Goldsmid's termination, served as a pretext for firing Goldsmid after the Defendants had already started the process of hiring Goldsmid's replacement is a legal issue addressed more fully on pp. 16-17, *infra*.

Four alleges a breach of contract claim. Following discovery, the Defendants filed this Motion for Summary Judgment.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa*., 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 249, 252 (1986).

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for

trial, not to determine the credibility of the evidence or the
truth of the matter.  *Anderson*, 477 U.S. at 249.


# III.

The Defendants argue they are entitled to summary judgment
on Goldsmid's two FLSA counts as a result of principles of claim
preclusion.  The Defendants also argue that Goldsmid was not the
victim of any retaliatory behavior under FLSA or CEPA.  Finally,
the Defendants assert that the SOPs do not constitute an
employment agreement, undermining Goldsmid's breach of contract
claim.  Each of these is addressed in turn.


## A.

As a preliminary matter, settlement agreements are
contracts, and therefore basic contract principles apply to
their interpretation.  *In re Cendant Corp. Prides Litig.*, 233
F.3d 188, 193 (3d Cir. 2000).  In arguing that Goldsmid's claim
is barred by principles of res judicata, the Defendants argue
the May 3, 2012 letter settling the New Jersey Department of
Labor investigation into Goldsmid's wages serves as a preclusive
settlement agreement.  This argument is without merit.

Under New Jersey law, "a written contract is formed when
there is a 'meeting of the minds' between the parties evidenced
by a written offer and an unconditional, written acceptance."

*Morton v. 4 Orchard Land Trust*, 180 N.J. 118, 129-30 (2004)

(quoting *Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526,

538-39 (1953)). There is no indication in the record that any

such written offer and acceptance between Goldsmid and Lee Rain,

Inc. occurred here. Rather, Goldsmid simply accepted $1,727.30

in wages in accordance with the May 3, 2012 agreement between

the NJDOL and Lee Rain, Inc. (Goldsmid Dep. at 49:15-19) That

agreement expressly provided that, "[t]his agreement does not

impair any worker's rights to pursue a claim for additional

wages." (NJDOL Settlement, May 3, 2012) There is no indication

that Goldsmid signed any document releasing Lee Rain, Inc. from

any claims he might have for overtime wages. In short, there is

no evidence in the record that Lee Rain, Inc. (or Fiocchi) made

an offer to Goldsmid, nor does his receipt of overtime wages

constitute an acceptance sufficient to demonstrate a meeting of

the minds. As such, there is no contractual agreement between

Goldsmid and Lee Rain, Inc. that precludes Goldsmid's recovery.

Nonetheless, the Defendants contend that res judicata bars

Goldsmid's recovery. "Res judicata, also called claim

preclusion, bars litigation of all matters that could have been

determined in prior litigation."[3] *Courteau v. United States*, No.

---

[3] According to Federal Rule of Civil Procedure 8(c), a Defendant must assert res judicata as an affirmative defense in response to a pleading. While the Defendants did not include this affirmative defense as part of the Answer to the Goldsmid's Complaint, (see Answer, dkt. no. 5), the Third Circuit permits parties to raise such affirmative defenses for the first time in a motion for

02-cv-0659 (JEI), 2007 WL 1456198, at *3 (D.N.J. May 14, 2007)

(citing *Williamson v. Columbia Gas & Elec. Corp.*, 186 F.2d 464,

469 (3d Cir. 1950)).  To invoke the doctrine of claim

preclusion, a defendant must show: (1) a prior suit involving

the same parties or their privies; (2) a final judgment on the

merits; and (3) the same cause of action in the subsequent suit.

*Courteau*, 2007 WL 1456198, at *3 (citing *Napier v. Thirty or

More Unidentified Federal Agents, etc.*, 855 F.2d 1080, 1086 (3d

Cir. 1988)).

Claim preclusion may be applied where the government

represents a private individual, but these determinations are

"very difficult," and depend upon the "interplay between public

and private rights." *Equal Emp't Opportunity Comm'n v. U.S.

Steel Corp.*, 921 F.2d 489, 494 (3d Cir. 1990) (quoting 18 C.

Wright, A. Miller, and E. Cooper, *Federal Practice and

Procedure*, § 4458, at 512-20 (1981)).  For example, where

Congress has created a comprehensive enforcement scheme that

precludes a plaintiff from independently pursuing a lawsuit

while an agency pursues litigation on the plaintiff's behalf,

that plaintiff may be bound by the agency's litigation.  *U.S.

Steel*, 921 F.2d at 494.  Under FLSA, a plaintiff may not

---

summary judgment.  *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1374 (3d
Cir. 1993); *see also Courteau*, 2007 WL 1456198, at *2-3; *Siebert v. Phelan*,
901 F.Supp. 183, 185 (D.N.J. 1995).

maintain a lawsuit if the Secretary of Labor commences proceedings by filing a complaint to obtain overtime wages. 29 U.S.C. § 216(b).

In Goldsmid's case, however, no such difficult questions arise. The undisputed record demonstrates that Goldsmid was never a party to any proceeding, formal or informal, regarding Lee Rain, Inc.'s alleged FLSA violations. Though Goldsmid initiated an investigation by calling both the federal and state authorities after his termination, Goldsmid did not participate in the investigation aside from receiving occasional updates from state investigators. (Goldsmid Dep. at 48:1-5, 48:17-18) More importantly, the Secretary of Labor never filed a complaint or instituted a proceeding against Lee Rain, Inc. that might otherwise have served to represent Goldsmid's interests. Because Goldsmid was not a party to the May 3, 2012 agreement between Lee Rain, Inc. and the NJDOL, and the Secretary of Labor did not institute a proceeding on his behalf, Goldsmid was not a party to any agreement with the NJDOL for preclusion purposes. The agreement therefore has no preclusive effect on Goldsmid's FLSA claims.

**B.**

The Defendants contend that they have not retaliated against Goldsmid in violation of FLSA or CEPA. The Court first

addresses Goldsmid's substantive FLSA claim before turning to
the two retaliation claims.

# 1.

Goldsmid contends that the Defendants have failed to
properly compensate him for overtime compensation, as required
by FLSA.  Under FLSA's maximum hours provision,

> [N]o employer shall employ any of his
> employees . . . for a workweek longer than
> forty hours unless such employee receives
> compensation for his employment in excess of
> the hours above specified at a rate not less
> than one and one-half times the regular rate
> at which he is employed.

29 U.S.C. § 207(a).  Exempt from this provision are any
employees who are employed in a "bona fide executive,
administrative, or professional capacity."[4]  § 213(a)(1).

Here, the undisputed record demonstrates that after
Goldsmid moved from an hourly wage to a fixed salary in March
2010, his weekly work hours exceeded forty hours on a number of
occasions between March 31, 2010 and July 1, 2011.  (See
Goldsmid Dep. at 30:19, NJDOL File, Defs. Ex. K, at 14-15)  The
Defendants contend that when Goldsmid transferred to a salaried
position, his salary was calculated by multiplying his hourly

---

[4] Each of these capacities are further defined by the Secretary of Labor.  *See*
29 C.F.R. §§ 541.100, 541.200, 541.300.  There is no indication that
Goldsmid's warehouse responsibilities satisfy any of the criteria contained
in those definitions, and the Court does not consider them further here.

rate (thirteen dollars per hour) times forty, and then including

five additional hours per week by adding the product of five

hours times nineteen dollars and fifty cents per hour (one and

one-half times his regular salary).[5] (Fiocchi Dep. at 84:1-9)

Even if the Court were to accept this to be the proper

calculation, Goldsmid worked in excess of forty-five hours

during the weeks of: 6/18/2010, 6/30/2010, 7/23/2010, 8/20/2010,

11/19/2010, 12/10/2010, 12/17/2010, 3/25/2011, 4/1/2011,

4/8/2011, 4/8/2011, and 5/6/2011. (NJDOL File, Defs. Ex. K, at

000014 – 15) During those weeks, the record shows that Goldsmid

was not compensated for more than forty-five hours of work. As

this shows that Goldsmid worked in excess of forty hours per

week without proper compensation, the Defendants are not

entitled to summary judgment on Goldsmid's FLSA claim alleged in

Count One.


**2.**

Under FLSA, it is unlawful to "discharge . . . any employee

because such employee has filed any complaint or instituted or

caused to be instituted any proceeding under this chapter. . .

." 29 U.S.C. § 215(a)(3). To establish a prima facie case of

---

[5] This formula results in a weekly salary of $617.50 for forty-five hours of
work. As Fiocchi conceded in his deposition testimony, Goldsmid was paid a
weekly salary of $615, slightly below the amount he was entitled to any time
that he worked a full forty-five hours. (Fiocchi Dep. at 89:8-25)

retaliatory discrimination, a plaintiff must demonstrate that:
(1) the plaintiff engaged in a protected activity, (2) the
employer undertook an adverse employment action against the
plaintiff, and (3) there was a causal link between the
plaintiff's protected action and the employer's adverse action.
*Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007);
*see also Barnello v. AGC Chems. Ams., Inc.*, No. 08-cv-03505
(WJM/MF), 2009 WL 234142, at *6 (D.N.J. Jan. 29, 2009) (applying
*McDonnell Douglas* retaliation standard to FLSA retaliation
claims).  After making the prima facie case, the burden shifts
to the employer to articulate a legitimate, non-retaliatory
reason for the adverse action.  *Marra*, 497 F.3d at 300.  If
successful, the burden of production returns to the plaintiff,
who must show by a preponderance of the evidence that the
employer's reason was false, and that the true source for the
adverse employment action was retaliation.  *Id.* (citing *Moore v.
City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)).

To engage in a protected activity, a plaintiff need not
formally file a written complaint with an employer; rather, a
verbal complaint that provides notice of the allegations to the
employer is sufficient to form the basis of a FLSA retaliation
claim.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131
S.Ct. 1325, 1335 (2011); *Shakib v. Back Bay Rest. Grp., Inc.*,
No. 10-cv-4564 (DMC/JAD), 2011 WL 4594654, at *7 (D.N.J. Sept.

30, 2011).  The record indicates that Goldsmid brought his overtime wage concerns to his direct supervisor, Debbie Martine,[6] and discussed his concerns about his salary with Fiocchi.  (See, e.g., Fiocchi Dep. at 140-43; Martine Dep. at 20:21-21:2)  Such actions raised Goldsmid's FLSA concerns with his superiors, and suffice to report a FLSA retaliation claim.  In addition, there is no dispute that Goldsmid was fired from his position on June 20, 2011.  (Fiocchi Dep. at 106:1-2)  Thus, Goldsmid's prima facie retaliation claim rests on whether he can demonstrate a causal link between his complaints and his firing.

To demonstrate causation in retaliation claims, the Third Circuit permits plaintiffs to rely on a "broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).  In considering this evidence, district courts focus "on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Patterson College of N.J.*, 260

---

[6] While the Defendants suggest that Goldsmid's failure to give a formal complaint to Fiocchi or his supervisor is fatal to his FLSA and CEPA claims, such a conclusion is not warranted.  There is no dispute that Goldsmid gave the Department of Labor fact sheet to his supervisor, (Martine Dep. at 20:21-21:2), and that he separately discussed his unhappiness over his overtime wages with Fiocchi, (Fiocchi Dep. at 140-43).  Though Martine apparently never read the fact sheet because she "tried to stay out of the conflict . . . [and] just wanted to go to work and do my job and go home," her failure to read the fact sheet does not change the fact that Goldsmid reported his pay concerns to his supervisor.  (Martine Dep. at 22:4-6)  Indeed, when Goldsmid told Martine on a different occasion that he was not "getting paid right," Martine told him to calm down and speak with Fiocchi or look for another job, further indicating her knowledge of his pay concerns.  (Id. at 22:25-23:2)

F.3d 265, 288 (3d Cir. 2001) (citing *Farrell*, 206 F.3d at 281).
Temporal proximity may suffice to demonstrate causation, for
example where a plaintiff was fired just two days after filing
an EEOC complaint. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d
Cir. 1989).  When the facts show that the temporal relationship
between the two is not "unusually suggestive," timing alone is
insufficient, absent other evidence, to constitute causation.
*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)
(holding that a nineteen-month gap, "standing alone," fails to
support a causal link).

   Though his termination was not immediate, sufficient
evidence in the undisputed record demonstrates causation for
Goldsmid's prima facie case.  Sometime around or shortly before
March 2011, Goldsmid approached Martine, his direct supervisor,
with information on FLSA overtime pay requirements.  (Martine
Dep. at 20:21-21:2; Goldsmid Dep. at 39-40)  Not long after
that, in March 2011, Fiocchi and Goldsmid had two conversations
regarding Goldsmid's salary and hours.  (Fiocchi Dep. at 140:14-
143:12)  Approximately three months later, Goldsmid was
terminated on June 20, 2011.  (Goldsmid Dep. at 46:16-18)  While
this timing alone is not "unusually suggestive," just one day
after his termination, two new employees started in the
warehouse, filling Goldsmid's role.  (Fiocchi Dep. at 110:2-10,
111:16; Goldsmid Dep. at 54:12)  Although the Defendants contend

16

that the decision to hire new warehouse employees was made a month before, in anticipation of the busy summer season, the choice of start date just one day after Goldsmid's termination might give rise to an inference that the decision to fire Goldsmid was made weeks earlier but delayed to the day before his replacement would start. (Fiocchi Dep. at 111:22-112:15) Though Goldsmid reported that he faced no other adverse employment actions besides his June 2011 termination, (Goldsmid Dep. at 46:7-15), the undisputed evidence regarding the timing of his firing and replacement creates a question of material fact and is therefore sufficient to withstand the Defendants' Motion. As such, Goldsmid has demonstrated sufficient causation to state a prima facie claim of retaliation.

The Defendants contend that even if Goldsmid demonstrates a prima facie retaliation claim, the undisputed record demonstrates a legitimate, non-retaliatory reason for his termination. Specifically, the Defendants assert that Goldsmid was "disruptive" and that he failed to perform his job duties up to expectations. (Fiocchi Dep. at 115:21, 102:12-24) Thus, Goldsmid's FLSA retaliation claim turns on whether he can show that the Defendants' assertions are simply a pretext.

When deciding a motion for summary judgment seeking to rebut a legitimate, non-retaliatory reason for termination, district courts require the plaintiff to produce "sufficient

evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1064, 1067 (3d Cir. 1996)). Ordinarily, a plaintiff may do so by demonstrating weaknesses, incoherence, implausibility, or contradictions in the employer's rationale that a reasonable factfinder could "rationally find [the rationale] 'unworthy of credence.'" *Krouse*, 126 F.3d at 504 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)).

In view of the record, Goldsmid has produced sufficient evidence to call the Defendants' rationale into question. In particular, Fiocchi described the box-throwing incident just "two or three weeks" prior to Goldsmid's termination as an example of Goldsmid's disruptive behavior, after preparations for hiring Goldsmid's replacement were already underway. (Fiocchi Dep. at 101:20-103:12) In this incident, after Todd Fiocchi told Goldsmid that he had pulled the incorrect items out of the warehouse, Goldsmid apparently threw a box across the shop, "and said I'm only doing my job, you know, I don't know how I'm going to f'g do it any better. . . ." (Id. at 103:6-7) However, under questioning regarding Goldsmid's performance as an employee of Lee Rain, Ron Petrowski (witness to the box-

throwing incident) failed to include any details regarding Goldsmid's disruptive behavior in the shop or during the course of Goldsmid's work performance.  In addition to this inconsistency, Goldsmid was never subject to any discipline leading up to his termination.  While Fiocchi asserts that he spoke with Goldsmid on more than five occasions about his performance as an employee, Goldsmid indicated that he was never written up or otherwise sanctioned.  (Fiocchi Dep. at 117:25; Goldsmid Dep. at 46)  These inconsistencies suggest that the Defendants' reason for Goldsmid's termination may have been a pretext, and Goldsmid has therefore met his burden to withstand summary judgment.

### 3.

The Defendants contend that they are entitled to summary judgment on Goldsmid's CEPA retaliation claim.  CEPA provides that "[a]n employer shall not take any retaliatory action against an employee because the employee . . . discloses . . . an activity, policy or practice of the employer . . . that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ." N.J.S.A. 34:19-3(a).  A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action . . . ."  N.J.S.A. 34:19-2(e).

To bring a CEPA retaliation claim, a plaintiff must demonstrate:

> (1) He or she reasonably believed that his or her employer's conduct was violation either a law, rule or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt*, 177 N.J. 451, 462 (2003). Like FLSA retaliation claims, an employer may respond to this prima facie showing by demonstrating a legitimate, non-retaliatory reason for the plaintiff's termination. *Schlichtig v. Inacom Corp.*, 271 F.Supp.2d 597, 614 (D.N.J. 2003). The plaintiff may then withstand a summary judgment motion by pointing to evidence, direct or circumstantial, that would permit a reasonable factfinder to "'either (1) disbelieve [the] articulated legitimate reasons [for his termination]; or (2) believe that [his protected conduct] was more likely than not a motivating or determinative' factor in his termination." *Id.* (first and third alteration in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)).

Thus, with just one distinction, FLSA retaliation claims and CEPA retaliation claims require the same analysis. Under FLSA, in addition to demonstrating an adverse employment action

and causation as part of the prima facie case, a plaintiff must show that he engaged in a protected activity. *See Barnello*, 2009 WL 234142, at *6. Under CEPA, this protected activity requirement is divided into two parts: (1) a reasonable belief that the employer violated the law, and (2) a whistle-blowing activity under N.J.S.A. 34:19-3c. *Dwoznar*, 177 N.J. at 462. This first requires a showing that a plaintiff reasonably believes his employer violated the law. *Id.* (citing *Estate of Roach v. TRW, Inc.,* 164 N.J. 598, 613 (2000)). Next, a plaintiff must "'furnish the trial court with enough by way of proof and legal basis to enable the court to determine as a matter of law' that the plaintiff has identified 'the asserted violation with adequate particularity' for a jury's consideration." *Klein v. Univ. of Med. and Dentistry of N.J.*, 377 N.J. Super. 28, 40 (N.J. Super. Ct. App. Div. 2005) (quoting *McLelland v. Moore*, 343 N.J. Super. 589, 601 (N.J. Super. Ct. App. Div. 2001)).

Here, Goldsmid has satisfied these two elements of his prima facie CEPA retaliation claim. In particular, his provision of the Department of Labor fact sheet manifests his concerns with overtime pay in violation of FLSA, serving as a reasonable belief that the Defendants violated the law. (Goldsmid Dep. at 33:8-9) Second, though the Defendants contend Goldsmid "merely complained about not making enough money,"

21

(Defs. Br. at 9-10), Goldsmid brought the Department of Labor fact sheet to his direct supervisor at Lee Rain, Inc., (Martine Dep. at 20:21-21:2; Goldsmid Dep. at 32:12). In doing so, Goldsmid disclosed a potential violation of a federal statute to his supervisor, raising a sufficiently particular infraction under N.J.S.A. 34:19-3(a)(1), and therefore satisfying the second CEPA retaliation factor.

In all other respects, the requirements to maintain a CEPA retaliation claim are identical to a FLSA retaliation claim. Goldsmid has met this burden in the FLSA retaliation context, and therefore summary judgment on Goldsmid's CEPA retaliation claim in favor of the Defendants would be inappropriate.

### c.

Under New Jersey law, there is a strong presumption that all employment relationships are terminable at will by either party unless otherwise specified. *See Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397-98 (1994). However, employment manuals that spell out specific terms for termination can give rise to contractual obligations,

> if a plaintiff can prove that an employment manual containing job-security and termination procedures could reasonably be understood by an employee to create binding duties and obligations between the employer and its employees, the manual will constitute, in effect, a unilateral offer to contract that

> an employee may accept through continued
> employment. Only in those circumstances will
> an employment manual overcome the presumption
> that the employment is at will.

*Id.* at 399 (citation omitted).

To determine whether an employment manual creates a contractual relationship, the "key consideration . . . is the reasonable expectations of employees." *Id.* at 392. Though there is no "categorical test," the New Jersey Supreme Court identified certain factors indicating that an employment manual, when fairly read, gives rise to a contractual relationship: (1) the "definiteness and comprehensiveness of the termination policy," and (2) the "context of the manual's preparation and distribution." *Id.* at 393-94.

In view of these factors and Goldsmid's reasonable expectations of the SOPs, the Court finds that Goldsmid was an at-will employee. Looking first at the termination policy in the SOPs, the five-page packet contains just two relevant sentences: "There will be a process put in place that will hold personnel accountable and responsible of there (sic) work performance. When there is an issue or not following the process and procedures as listed in this document the following actions will occur in these steps . . . ." (Lee Rain Inc. SOPs, at 4) Such a policy cannot be properly construed as comprehensive. Turning to the distribution of the SOPs,

Goldsmid could not recall any company-wide meetings regarding the SOPs, nor did he ever discuss it with any coworkers. (Goldsmid Dep. at 60:22)  These SOPs were not formally distributed to employees, but instead were occasionally provided verbally and in hard copy.  (Fiocchi Dep. at 36:3-5)

Most significantly, Goldsmid understood the SOPs to be "an outline on my position.  What some of the job duties and responsibilities were."  (Goldsmid Dep. at 60:12-13)  Lee Fiocchi described the SOPs in similar terms, explaining them as a "guideline" on how to perform daily tasks.  (Fiocchi Dep. at 38:12-16)  In other words, Goldsmid's reasonable expectation was that the SOPs served as guidelines for job performance, rather than a formal arrangement that redefined his position in the warehouse.  As such, the SOPs do not constitute an employment contract, and Goldsmid was therefore an at-will employee.  As an at-will employee, the Defendants were free to terminate Goldsmid's employment freely, and the Court will grant the Defendants' motion as to Count Four.

## V.

Based on the foregoing, the Court will deny Defendants' Motion for Summary Judgment as to the FLSA and CEPA claims in Counts One, Two, and Three, and will grant the Motion as to

Count Four's breach of contract claim.  An appropriate Order accompanies this Opinion.


Date: 2-6-14

                                      s/ Joseph E. Irenas
                                      **Joseph E. Irenas, S.U.S.D.J.**